**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TIMOTHY C. HARRY and KAREN C. HARRY,<br><br>*Plaintiff*s,<br><br>v.<br><br>AMERICAN BROKERS CONDUIT, APEX MORTGAGE SERVICES, FIDELITY NATIONAL TITLE GROUP, AMERICAN HOME MORTGAGE SERVICING, INC., DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2007-2 MORTGAGE-BACKED PASS-CERTIFICATES, SERIES 2007-2, HOMEWARD RESIDENTIAL, MORTGAGE ELECTRONIC RECORDING SYSTEM, INC., OCWEN LOAN SERVICING and KORDE & ASSOCIATES,<br><br>*Defendants*. | CIVIL ACTION NO. 16-10895 |

**DEFENDANT OCWEN LOAN SERVICING, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

### I.   INTRODUCTION

Plaintiffs' Motion for Summary Judgment repeats their now familiar refrain that their mortgage loan is void *ab initio* based upon allegations that the originating lender, American Brokers Conduit ("American Brokers"), was not incorporated as a legal entity or authorized to conduct business in Massachusetts as of their loan's closing date. Plaintiffs rely on this erroneous contention to prove, as a matter of law, that Ocwen violated the Federal Fair Debt Collection Practices Act ("FDCPA") by attempting to collect on a mortgage loan that it "knew or should have known" was invalid and unenforceable. To prevail on their FDCPA claim, Plaintiffs are

required to show through objective, record evidence that Ocwen sent Plaintiffs correspondence misrepresenting the amount, character or legal status of the mortgage loan at issue, and/or used unconscionable means to collect the debt. Plaintiffs have failed by a wide margin to meet their burden of proof. This failure alone is fatal to their claim. Indeed, instead of providing this Court with objective evidence showing *what* specific contents of Ocwen's correspondence were misleading or deceitful and *how* these statements misrepresented the status or amount of their loan, Plaintiffs instead rely on a litany of irrelevant arguments that—even if supported by the record evidence—would not support an FDCPA claim. Because Plaintiffs' Summary Judgment Motion omits any evidence to prove an FDCPA violation, Plaintiffs' allegations and claims are unsubstantiated by the record evidence, and so Plaintiffs' FDCPA claim fails as a matter of law. Accordingly, this Court should deny Plaintiffs' Motion for Summary Judgment and enter judgment in favor of Ocwen on the remaining count (Count IV) for alleged violations of the FDCPA in Plaintiffs' Amended Complaint.

## II. ARGUMENT

### A. Plaintiffs' FDCPA Claim Fails as a Matter of Law Because They Have Not Provided Objective, Record Evidence that Ocwen Violated Any Section of the Statute

#### 1. Plaintiffs Failure to Reference Any Correspondence that Ocwen Sent is Fatal to Their FDCPA Claim

At the outset, Plaintiffs' FDCPA claim fails as a matter of law because they have not offered any objective evidence, whatsoever, to prove that Ocwen's collection practices violated the statute. By their Amended Complaint, Plaintiffs generally claimed that Ocwen made "false representation[s] of the character, amount or legal status of the alleged debt," and used "unconscionable means to collect on a void *ab initio* debt." However, at this stage of litigation, and in order to obtain, much less survive summary judgment, Plaintiffs are required to present

objective, record evidence to substantiate these general allegations. To prevail on their FDCPA claim, Plaintiffs must show that Ocwen violated the FDCPA by sending correspondence that misrepresented the status, amount or character of their mortgage loan (15 U.S.C. § 1692e), and/or that Ocwen used unconscionable means to collect the debt through its communications with Plaintiffs (15 U.S.C. § 1692f). Plaintiffs' Summary Judgment Motion is entirely devoid of any such evidence. This alone is fatal to their FDCPA claim.

In deciding Ocwen's Motion to Dismiss, this Court dismissed the FDCPA claim as untimely as against the other defendants, but allowed the FDCPA claim to survive the motion to dismiss stage as to Ocwen. This Court reasoned that Plaintiffs' FDCPA claim appeared to be "timely as to Ocwen's alleged conduct with regard to three specific letters that Ocwen sent Plaintiffs": (1) a June 10, 2015 notice of default stating an amount past due of $223,611.23; (2) a July 1, 2015 letter notifying Plaintiffs of Ocwen's intent to foreclose; and (3) a January 28, 2016 letter from Ocwen's local counsel threatening litigation if Plaintiffs did not pay the amount past due on their mortgage loan. [Doc. 120, at p. 18.] In doing so, this Court acknowledged that the scope of Plaintiffs' FDCPA claim was limited to the three letters that fell within the one-year limitations period. 15 U.S.C. § 1692k(d).

Despite the limited nature of their FDCPA claim, Plaintiffs fail to offer any record evidence on summary judgment record to prove up their general allegations that these letters "contained confusing amounts" or contained misleading or false information. (Amended Complaint, ¶¶ 117-19, 122.) Plaintiffs do not even mention these letters in their Motion for Summary Judgment—let alone provide any evidence to establish that Ocwen's conduct in sending these letters violated the FDCPA. Indeed, Plaintiffs' Motion for Summary Judgment is silent as to *which* correspondence contain misleading or deceitful information regarding the loan;

*what* specific contents in the correspondence was misleading or false; or *how* such information violated a particular section of the FDCPA.

The deficient nature of Plaintiffs' claim is underscored by the fact that nowhere in their Motion for Summary Judgment do Plaintiffs even reference a particular section of the statute upon which they base their claim, or point to a single correspondence that Ocwen sent to Plaintiffs (even in addition to the three letters referenced in their Amended Complaint) that they allege contained misrepresentations regarding their loan. Instead, Plaintiffs continue to rely on various speculative theories that the loan was void and unenforceable. However, because Plaintiffs have failed to put forth evidence to show how any letters that Ocwen sent to Plaintiffs contained misleading or false information, or were sent for the purpose of using unconscionable means to collect a debt, their claim fails as a matter of law. *See Whittiker v. Deutsche Bank National Trust Co.*, 605 F. Supp. 2d 914, 926 (N.D. Ohio 2009) (holding that the absence of any factor is fatal to a plaintiff's claim under the FDCPA).

    **2.**    **Ocwen's Procurement of Hazard Insurance or Imposition of Attorneys' Fees Were Authorized Pursuant to the Mortgage and, Thus, Do Not Support a FDCPA Violation**

To the extent that Plaintiffs claim that Ocwen's imposition of hazard insurance or assessment of legal fees relating to the foreclosure proceedings violated the FDCPA, this argument lacks merit. Plaintiffs generally allege that these charges were somehow improper, but fail to reference any correspondence, or point to any specific statements within any correspondence, that would prove Ocwen's collection practices violated the FDCPA.

With regard to the hazard insurance, Plaintiffs claim that Ocwen force-placed a policy on the Property and charged Plaintiffs $1,664 for the policy in addition to "taxes and insurance [that] were part of the escrow fees" and that this violated the FDCPA. (Plaintiff's MSJ, p. 9.)

4

This argument is not support by the undisputed record evidence. Contrary to Plaintiffs' contention, Ocwen did not force-place any new policy on the Property, but rather continued to pay the Plaintiffs' existing hazard insurance policy, and renewed the policy to prevent it from lapsing. This is evidenced by the escrow account letters sent to the Plaintiffs that show the hazard insurance payments were included as part of the escrow account, which Ocwen was permitted to do pursuant to the terms of the Mortgage. (*See* copies of escrow account letters attached to Ocwen's Response to Plaintiffs' Concise Statement of Material Facts ("Plaintiff's SOF") as *Exhibit D*.) Further, Ocwen's corporate witness testified during her 30(b)(6) deposition that she reviewed the payment history for this loan and confirmed with the insurance department that there was never any force-placed insurance charged to the Plaintiffs' account. (*See* excerpts from Ocwen's 30(b)(6) deposition of Katherine Ortwerth attached to Ocwen's Response to Plaintiffs' SOF as *Exhibit C*, pp. 125-28.)

Plaintiffs do not dispute the fact that they defaulted on their loan in November, 2008. (Ocwen's SOF, ¶¶ 9-10.) Pursuant to the Mortgage, Ocwen, on behalf of the lender and/or their assigns, was authorized to take such actions necessary to protect the lender's interests in the Property, including the procurement of a new hazard insurance policy or renewal of an existing insurance policy. Specifically, Section 5 of the Mortgage provides, in relevant part, "If Borrower fails to maintain [hazard insurance], Lender may obtain insurance coverage, at Lender's option and Borrower's expense." (Ocwen's SOF, *Exhibit E*.) Thus, Ocwen was authorized—and, in fact, obligated—to obtain and/or continue to make payments on the existing hazard insurance policy after Plaintiff's' default to make sure the Property was properly insured and protected. The cost of this insurance was appropriately included as part of the escrow payment and added to the outstanding debt, per Section 5 of the Mortgage. Moreover, Ocwen sent Plaintiffs several

letters during the lifetime of the Loan advising that the current hazard insurance policy was insufficient, additional coverage was required, and that Ocwen would be required to make payments on behalf of Plaintiffs to avoid the policy from lapsing in the event that they failed to make timely payments. (*See* Ocwen's Response to Plaintiffs' SOF, *Exhibit C*, pp. 125-29.)

Plaintiffs further argue that Ocwen improperly charged them for "litigation fees" three years before a complaint was filed in violation of the FDCPA. (Plaintiff's MSJ, p. 13.) Plaintiffs' argument, again, misses the mark. The legal fees charged to Plaintiffs' account are not related to the present litigation. Instead, the legal fees referenced in the payoff statement related to the foreclosure proceedings that Ocwen was forced to commence on behalf of the investor after the Plaintiffs defaulted on their mortgage payments and failed to bring their account current. (*See* excerpts from Ocwen's Comments Log attached to Ocwen's Response to Plaintiffs' SOF as *Exhibit E*; *see also Exhibit C*, pp. 141-45.) Just as with the property insurance, Ocwen was authorized to charge Plaintiffs attorneys' fees pursuant to the Mortgage. Section 14 of the Mortgage provides in relevant part, "Lender may charge Borrower fees for services performed in connection with Borrower's default…including, but not limited to, attorneys' fees, property inspection and valuation fees." (Ocwen's SOF, *Exhibit E*.) Accordingly, because the investor incurred these expenses as a direct result of Plaintiffs' default, Ocwen, on behalf of the investor, was authorized to charge these fees to Plaintiff's mortgage loan account, per the express terms of the Mortgage. (*See id.*)

Further, and most importantly, Plaintiffs make no argument in their Motion for Summary Judgment that the actual amounts assessed to the account for the hazard insurance and attorneys' fees were not accurate. Accordingly, to the extent Plaintiffs rely on these charges as the basis of their FDCPA claim, their claim fails as a matter of law.

B. **Plaintiffs' FDCPA Claim Fails as a Matter of Law Because Plaintiffs Have Failed to Prove Through Objective, Record Evidence that the Loan Was Void and Unenforceable**

1. **American Brokers Was Licensed Entity at the Time the Loan was Originated**

Plaintiffs maintain, as they have throughout this entire litigation, that the loan is void and unenforceable, but have failed to offer any objective evidence to substantiate this speculative allegation. As discussed in detail in Ocwen's Motion for Summary Judgment, Plaintiffs have not proven that American Brokers was a "non-legal entity" to claim a void mortgage. The undisputed facts of this case demonstrate that American Brokers Conduit exists as a subsidiary of American Home Mortgage Holdings, Inc. and was an active, duly-licensed foreign corporation at the time of the loan origination in December, 2006. (Ocwen's SOF, ¶ 24, and *Exhibit M*.) Records maintained with the Division of Banks for the Commonwealth of Massachusetts demonstrate that the Commissioner of Banks issued a mortgage company license to American Home Mortgage to engage in the business of a mortgage lender and mortgage broker in Massachusetts on or about March 21, 2000, with license no. MC 1368. (Ocwen's SOF ¶ 25, and *Exhibit M*.)[1]

Moreover, even if American Brokers was not registered as a fictitious name with the local business database, as Plaintiffs allege, this does not support Plaintiffs' argument that the loan should be deemed void as a result. The fact there is no certificate filed with the local business database registering American Brokers as a fictitious name does not invalidate the

---

[1] To the extent that Plaintiffs are alleging that Ocwen's counsel asserted attorney-client privilege during Ocwen's 30(b)(6) deposition in an attempt to circumvent the statutory scheme promulgated by the Commission of Banks, this argument is unsubstantiated and completely without merit. Ocwen's witness answered all questions posed by Plaintiffs' counsel relating to the witness's understanding of American Brokers license at the time of the loan transaction. It was only when Plaintiffs' counsel asked specifically about communications between Ocwen's witness and Ocwen's counsel that Ocwen's counsel asserted the attorney-client privilege and instructed the witness not to answer. Thus, contrary to Plaintiffs' specious claim, Ocwen's witness testified as to all non-privileged information and her first-hand knowledge regarding the licensure of American Brokers.

entire loan transaction. Indeed, as discussed above, American Home Mortgage Corp. was a registered foreign corporation duly-licensed under Massachusetts law, and American Brokers was one of many subsidiaries authorized to conduct business under American Home Mortgage Corp.'s umbrella. Further, Plaintiffs cite no case law or statute to support their allegation that American Brokers was required to be incorporated under the laws of Massachusetts to engage in loan transactions and that the absence of such a license somehow voids the Mortgage. Accordingly, based on the record evidence presented in this case, Plaintiffs have failed to prove that American Brokers was a non-existing entity at the time the loan was originated in 2006, or that any use of a fictitious name renders the loan void.

### 2. The Cease and Desist Order Does Not Retroactively Invalidate the Mortgage Loan

While not entirely clear from their Motion for Summary Judgment, it appears Plaintiffs' claim of "illegality" is premised, at least in part, upon the theory that the loan transaction between them and American Brokers was "illegal" because the Cease and Desist Order is evidence that American Brokers was a non-existing entity unlicensed to conduct business in Massachusetts. That argument fails for several reasons.

First, Plaintiffs' reliance on Chapter 255E is misplaced. Plaintiffs argue that American Brokers violated Chapter 255E by using a fictitious name and illegally conducted business in Massachusetts. (Plaintiff's MSJ, pp. 4-5.) Chapter 255E grants to the Commissioner of Banks ("Commissioner") the exclusive authority for implementing and enforcing the Commonwealth's regulations of the mortgage lending industry. G.L. c. 255E, § 9. Further, Chapter 255E provides the Commissioner with full investigatory and enforcement power, and authority to institute a wide range of penalties for violations, including license suspension or revocation, fines or imprisonment. *See* G.L. c. 255E, §§ 10-11. The remedies promulgated by this Chapter are

exclusively penal in nature. Since Chapter 255E is a penal statute in which violations of regulations are punishable by fines or imprisonment, no private remedy can be said to exist unless the private remedy "appears by express terms or by clear implication to have been the legislative intent." *See Johnson v. United States Steel Corp.*, 348 Mass. 168, 169-70 (1964). No such private right of action exists by the statute's express terms. *See* M.G.L. c. 255E. Nor can such a private right be found by clear implication of the Legislature. *See Davey Bros., Inc. v. Stop & Shop, Inc.*, 351 Mass. 59, 63 (1966) ("It is a settled canon of statutory construction that penal statutes are to be construed strictly and not to be extended by implication"). By the express terms of the statute, the Legislature intended only public enforcement, i.e., modification, suspension, cancellation or revocation of license by the Commissioner and the imposition of fines and/or imprisonment. *See Johnson*, 348 Mass. at 169-70. Thus, private parties, like the Plaintiffs, have no basis attempt to enforce Chapter 255E because neither Chapter 255E, nor any other law, provides for such a private remedy.

Moreover, the Commissioner in issuing the Cease and Desist Order did not intend to permit the Plaintiffs to void their mortgage loan based on American Brokers violation of the banking statutes. In construing a statute which imposes specific penalties for its violation, the Court must examine the entire act to determine whether or not it was the purpose of the Legislature, in addition to imposing express penalties for the violation of the law, to render void any contract based on the prohibited act. Here, there is no language in the Cease and Desist Order indicating that the Commissioner intended it to have any retroactive effect on loan transactions that pre-dated the Order. In truth, the Cease and Desist Order demonstrates conclusively that American Brokers Conduit was licensed or otherwise permitted to originate loans.

There is no express provision in Chapter 255E which states that a lender's failure to comply with the provisions would render all contracts void. Thus, here, Plaintiffs cannot render void their loan transaction due to a violation of banking regulations by American Brokers. Indeed, such an implication would be inconsistent with, and even undermine, the underlying purpose of the regulatory scheme. Permitting Plaintiffs to avoid or walk away from the repayment of their loan pursuant to a regulatory lending limit violation would harm the assets of the institution, its shareholders, and its depositors, whom the regulations were designed to protect. Moreover, it would represent a complete windfall to Plaintiffs who admit actually receiving and using the loan proceeds. (Ocwen's SOF, ¶¶ 5-7.)

C. **Plaintiffs' FDCPA Claim Fails as a Matter of Law Because Plaintiffs Have Failed to Prove Through Objective, Record Evidence that the Note or Mortgage Was Fraudulent and, Thus, Unenforceable**

In a blatant attempt to save their deficient FDCPA claim, Plaintiffs toss in a "fraud" theory to see if it sticks. Despite the fact that Ocwen produced the original note and a copy of the original Mortgage at its 30(b)(6) deposition, Plaintiffs make the unfounded claim that there was "no original note anywhere" and that the Note and Mortgage produced were apparently fraudulent. (Plaintiff's MSJ, pp. 5-6.) Plaintiffs' tenuous claim is based on a far-reaching theory that the signatures on the Note and Mortgage "had been forged" because Ocwen admitted in its Comment Log produced to Plaintiffs that the signatures on the loan documents did not match the Plaintiffs' signatures on a third-party authorization letter that Plaintiffs sent to Ocwen on or around June, 2015. (*See id*.) Specifically, Plaintiffs claim that on or about July 20, 2015, Ocwen responded to Plaintiffs' authorization letter by stating that a review of their loan documents indicates that the signature is not matching with the authorization letter provided. (Plaintiffs' MSJ, pp. 5-6.) Plaintiffs maintain that this is when they first knew that they were victims of

fraudulent lending documents that had been forged. (*Id.*) This argument is meritless and is contradicted by the undisputed facts of this case.

First and most importantly, Plaintiffs do not dispute the fact that they signed the Mortgage and the Note. Plaintiff Timothy Harry unambiguously testified during his deposition that he signed both loan documents:

> Q. Did you sign this mortgage?
> A. That's my signature.
> Q. Do you claim that you did not sign this document?
> A. I do not.
> Q. So you did sign this document, correct?
> A. That's correct.
> Q. And then if you go to page 6 . . . is this your signature?
> A. Yes.
> Q. Do you claim that you did not sign the [note]?
> A. I do not.

(*See* excerpts from Timothy Harry's Deposition attached to Ocwen's Response to Plaintiffs' SOF as *Exhibit A*, pp. 54-56, 58-60.) Plaintiff Timothy Harry also testified that he signed ***all*** of the loan documents, not just the Mortgage and the Note. (*See id*. at pp. 134-35.) According to his deposition testimony, Mr. Harry's basis for claiming that their signatures were "forged" on the loan origination documents relates only to his initials on certain loan documents—not his actual signatures. (*See id*.) Moreover, Plaintiff Karen Harry also clearly testified during her deposition that she signed the Mortgage:[2]

> Q. But sitting here today, you are not claiming that you did not sign the mortgage, correct?
> A. Correct.

(*See* excerpts from Karen Harry's Deposition attached to Ocwen's Response to Plaintiffs' SOF as *Exhibit B*, p. 40.) Plaintiffs further testified during their depositions that they signed the June, 2015 authorization letter and do not dispute this fact. (Ocwen's Response to Plaintiffs' SOF,

---

[2] Plaintiff Karen Harry was not named in the Note and, thus, did not sign the Note. (Ocwen's SOF, *Exhibit A*.)

*Exhibit B*, pp. 83-85.) Thus, Plaintiffs cannot now claim that their signatures on the Mortgage and Note were forged when they both testified under oath that they signed the Mortgage and the Note. The specious nature of Plaintiffs' "fraud" allegations is further underscored by the fact that Plaintiffs do not dispute the fact that they resent a request for third-party information, that letter was accepted, and their counsel was granted access to receive information relating to their mortgage loan account. (Ocwen's Response to Plaintiffs' SOF, *Exhibit A*, pp. 132-34; *Exhibit B*, pp. 88-89.) Indeed, Ocwen was following its standard procedure to ensure the request for authorization was genuine and being sought by the borrowers. Ocwen was simply doing its due diligence to comply with relevant federal and state laws regulating the dissemination of private information. Thus, for the reasons discussed above, their theory that Ocwen admitted that Plaintiffs' signatures on the loan documents were forged is completely without merit.

**D.    Plaintiffs' Argument that Ocwen's Comments Log Contains "Judicial Admissions" is Incorrect and Should be Disregarded by this Court**

Plaintiffs rely on Ocwen's Comments Log to make the illogical argument that Ocwen made several "admissions" regarding the Plaintiffs' account including that the investor "has the original note, but not the original mortgage," and further that "the signature on the alleged original note does not match the Plaintiffs, no party has a note and a note was fraudulently created." (Plaintiffs' MSJ, p. 7.) Plaintiffs further allege that a "second mortgage was fraudulently created for the Collateral File." (*See id*.) Plaintiffs argue that Ocwen's notes are "judicial admissions" that should be considered by this Court on summary judgment, but this is incorrect. Judicial admissions are, fundamentally, admissions made *in the case at bar. See United States v. Raphelson*, 802 F.2d 588, 592 (1st Cir. 1986). Thus, a statement made by an Ocwen employee in its business records pre-suit cannot be said to be a judicial admission that has conclusive effect. What Ocwen's employees said elsewhere may be probative evidence, but,

like any other evidence, it is subject to contradiction. *Id; see also Int'l Shipping Agency, Inc. v. Unión De Trabajadores De Muelles Local 1740*, 2015 U.S. Dist. LEXIS 111299, at *28-29 (D.P.R. Aug. 21, 2015). Here, Ocwen has offered ample evidence to refute Plaintiffs' argument that such statements somehow prove that the Note and/or Mortgage were fraudulent.

As discussed above, the original Mortgage was recorded in the chain of title at the Registry of Deeds, and thus Ocwen would not have retained the original; only the original Note. As such, a "second mortgage" was not created by Ocwen, but rather Ocwen retained a certified copy of the original Mortgage that was included in the Collateral File. Moreover, the fact that Ocwen determined that the signatures on the Plaintiffs' first third-party authorization letter did not match the Plaintiffs' signatures on certain loan documents does not support Plaintiffs' specious claim that their signatures were forged. This is especially true where the Plaintiffs admit that they signed the Mortgage and the Note, and that they sent a second authorization letter which was accepted by Ocwen. Accordingly, because Plaintiffs erroneously argue that pre-suit comments made by Ocwen's employees are "judicial admissions" to be given conclusive effect by this Court, and further the comments do support Plaintiffs' specious claim that the loan documents were forged, this Court should disregard these comments as they have no probative value and do not provide any evidentiary support for Plaintiffs' FDCPA claim.

### III.     CONCLUSION

For the reasons stated above, Ocwen respectfully requests that this Court deny Plaintiffs' Motion for Summary Judgment, and enter judgment in Ocwen's favor as to the remaining count (Count IV) in Plaintiffs' Amended Complaint.

Attorneys for Defendant,

OCWEN LOAN SERVICING, LLC,

*/s/ Vanessa V. Pisano*
Samuel C. Bodurtha, BBO #665755
Vanessa V. Pisano, BBO #679649
HINSHAW & CULBERTSON LLP
53 State Street, 27th Floor
Boston, MA 02109
Tel: (617) 213-7000 / Fax: (617) 213-7001
Email:  sbodurtha@hinshawlaw.com
            vpisano@hinshawlaw.com

## **CERTIFICATE OF SERVICE**

I, Vanessa V. Pisano, hereby certify that the documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 20, 2018.

/s/ *Vanessa V. Pisano*
Vanessa V. Pisano